982 So.2d 724 (2008)
Gaye L. CRAIG, the Wife, Appellant,
v.
Robert W. CRAIG, Husband, Appellee.
No. 1D07-0847.
District Court of Appeal of Florida, First District.
April 21, 2008.
Rehearing Denied May 29, 2008.
*725 H. Price Poole, Jr. of Poole & Poole, P.A., Fernandina Beach; and Michael G. Tanner and Stuart F. Williams of Tanner Bishop, Jacksonville, for Appellant.
Barry S. Sinoff, Jacksonville; and Michael J. Korn and Mary C. Coxe of Korn & Zehmer, Jacksonville, for Appellee.
WOLF, J.
Gaye Craig, the former wife, appeals from a final judgment of dissolution of marriage from Robert Craig, the former husband. The former wife raises a number of issues, one of which we find dispositive. The former wife asserts that the trial court's determination that she can develop a portion of the parties' real estate and sell the portion distributed to her for a net revenue of $1,500,000 is not supported by competent substantial evidence (CSE). We agree. Because this determination was the cornerstone of the equitable distribution and support plans fashioned by the trial court, we reverse that portion of the order dealing with equitable distribution and support. The trial court shall readdress these issues on remand.
The parties were married on June 14, 1958, when the former wife was 18 years old and the former husband was 21 years old. The parties have three adult sons. When the parties were married, the former husband served in the U.S. Army for two years, worked briefly with a box company in Jacksonville, and in the early 1960's went to work for Container Corporation and its successor, Jefferson Smurfit (Smurfit), in Fernandina Beach. The former husband worked there for 36 years, until May 1997, and was responsible for instrumentation and process control. The former wife is a high school graduate and attended junior college for two years. Except for employment as a teacher's aide in 1970 and a nurse's aid in 1958, the former wife spent the entire marriage in the role of homemaker.
In March 2005, the former wife filed her Petition for Dissolution of Marriage requesting, among other things, "temporary and permanent possession, use and ownership of the marital home," as well as "temporary, rehabilitative and permanent alimony." Later, she amended her petition, adding an alternative count for partition of the parties' real property. At the time of the proceeding, the former husband was 68 years old and the former wife was 65 years old.
In the early 1960's, the parties purchased two contiguous residential lots in Fernandina Beach, each lot about five acres in size. The two lots, designated lot 12 and 13, are depicted on various diagrams received in evidence. The parties paid $3,000 for each lot. Later they conveyed a portion of the parcel to their youngest son, leaving them with 7.8 acres.
Lot 12 is situated to the south of lot 13, and both lots have access on the west to South 14th Street, a 65-foot-wide paved road. At the time of the proceeding, South 14th Street was the only roadway providing access to the property which met county code width requirements for access into a platted subdivision. Both lots are bounded on their east side (which the parties *726 refer to as the "back" side of the property) by Fernandina Avenue. Fernandina Avenue is a 30-foot-wide paved road. Situated to the immediate south of lot 12 is lot 11, which is bounded on its south side by Simmons Avenue, another paved road. Lot 11 is owned by a church.
Soon after acquiring the second lot, the parties constructed a four-room residence on Lot 12, in part using materials from a nearby house which they had demolished. They made various improvements and additions to their home over the years and were living in that home when the former husband retired from Smurfit in 1997. The parties also built a two-car garage on lot 12, which was later converted into a 900-square-foot apartment. After the former husband retired in 1997, he decided to build a new house on the 7.8 acres.
The former wife testified she resisted the project at first, objecting to the taking on of debt at their age. She testified she and the former husband "battled back and forth over this for about a year and finally I said, do whatever." Having eventually agreed, the former wife participated in the construction of the home by selecting the architect, assisting in the design of the home, and hiring carpenters, electricians, and painters to complete the home's interior.
The former husband testified that he did much of the construction on the house himself. Although the parties hired a general contractor, the contractor abandoned the job after six months, so the former husband took over those duties. The house was completed in 1998; it has 3,170 square feet with four bedrooms and three baths. The project remained a source of discord in the parties' marriage.
In order to finance the construction of the new residence, the parties borrowed $150,000 and signed a mortgage for that amount encumbering lot 12. Paragraph 17 of the mortgage provided:
Transfer of the Property or of Beneficial Interest In Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.
If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by their Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.
At the time of the proceeding, the balance due under the mortgage was $122,295.00.
At the proceeding, the former wife renewed her request to partition the property. The former husband opposed the former wife's request for partition through sale and asked that the property be equitably divided. The former husband testified that the fair market value of the house and adjacent property was $1 million to $1.2 million and that the fair market value of the remaining 4.5 acres was $1.7 million. He admitted, however, that no professional appraised the parties' property according to his subdivision plans. Nevertheless, he had considered the information he acquired from several real estate agents and listings when he opined that the back side *727 of the property could be developed into four or more residential lots at a cost of less than $200,000, yielding a net value for the back side of $1.5 million. The former husband did not provide any documentation justifying this figure nor did he testify that he had any expertise in real estate development.
The former husband also retained an expert land use planner and project manager from a Fernandina Beach engineering and planning firm. The planner had previously been employed as the Director of City Planning for the City of Fernandina Beach. She prepared a conceptual site plan for the undeveloped 4.5-acre parcel. In her opinion, the highest and best use of the 4.5-acre land would be a single family subdivision with 10-12 lots, which could be built in accordance with applicable city codes. She confirmed that such a project could have available water and sewer service, as well as utilities. However, the evidence is undisputed that, currently, the back side of the parcel is not permitted for residential development and does not have utility services. Additionally, the planner acknowledged that Fernandina Avenue, the road providing access to the proposed development, is 30 feet in width and does not meet the Nassau County width requirements for a right-of-way fronting a subdivision. Accordingly, actualization of the plan would require either the owner of lot 11 (a church) to give up 30 feet of its property or the county to grant the former wife a width variance.
At the end of the proceeding, the trial court requested and received from each party a proposed final judgment. The former husband's proposed judgment asked the trial court to take "judicial notice" of various facts concerning investment options available to the former wife with development proceeds from the back of the property, investment returns on any such proceeds, and the tax consequences of these transactions.
On January 30, 2007, the trial court rendered its Final Judgment of Dissolution of Marriage. The order was substantially similar to the former husband's proposed order. It awarded the former wife the back side of the property and awarded the former husband the marital home, apartment, and utility room. The order also required the former husband to be solely responsible for the mortgage on the property. It awarded the former wife bridge-the-gap alimony in the amount of $1,500 a month until she sells the back side property.
The final judgment awarded the former husband his pension and his personal accounts. It also made each party responsible for his and her individual attorney's fees and costs.
Significantly, the distribution and support plans were based on the former wife's ability to develop the property as the former husband proposed and to achieve the rate of return on investments at the amount of which the husband had asked the trial court to take judicial notice.
Factual findings on which the equitable distribution of assets and liability in the Final Judgment is based must be supported by CSE. Crockett v. Crockett, 708 So.2d 329, 330 (Fla. 1st DCA 1998). Where CSE does not support the trial court's factual finding, the trial court abuses its discretion. See Maddox v. Maddox, 750 So.2d 693 (Fla. 1st DCA 2000).
There is a lack of CSE supporting the distribution and support scheme fashioned by the trial court in at least five areas:
1) There is no evidence that the former wife, who was a 65-year-old woman in the beginning of these proceeding, a longtime homemaker (for most of the *728 48-year marriage) with no education or training in fields related to real estate development, has the skills or ability to develop the property;
2) There is no demonstration that the former wife could obtain a variance from the Nassau County Code requirements for right of way width fronting subdivisions, especially in light of the fact that the non-conformity is created by the trial court's subdivision of the property;
3) The former husband was not competent to testify regarding real estate development costs. No other evidence of these costs was presented;
4) There was no evidence that the land being given to the former wife would be released from the mortgage and acceleration clause which encumbered the entire property; and
5) The amount of investment income the former wife could obtain is not based on evidence presented at trial.
Real estate development has become a complicated undertaking. The former husband's development plan for the back side of the property  if it is feasible at all  will entail at least four major undertakings: 1) to obtain the necessary development permits and utility and road variance applications through local government; 2) to complete the site work depicted on the former husband's planner's diagram, including right-of-way improvements and installation of an entrance road, a stormwater retention facility, and septic tank systems; 3) to negotiate with lenders for financing for the project (because the final judgment awarded the former wife no cash from which to fund the development); and 4) to successfully market the finished lots at prices that will yield the $1.5 million "net fair market value" for the property found by the trial court.
While the former wife might be able to hire development professionals to assist with the project, there is neither evidence of the cost of doing so nor money awarded to her in the final judgment for that purpose.
The final judgment also does not address the Nassau County Code requirements for the right-of-way width fronting subdivisions and the effect on the proposed development plans. There is no evidence that a variance could be obtained. The requirements for obtaining a variance from a zoning code are stringent and will be granted only in unusual circumstances involving hardship. See Maturo v. City of Coral Gables, 619 So.2d 455, 456 (Fla. 3d DCA 1993). No evidence was ever presented concerning the feasibility of gaining a variance from what was essentially a self-created hardship.
The final judgment's imputation of a "reasonable investment income" to the former wife also rests on the finding that the cost to subdivide and develop the back side into residential lots would be $200,000 (thus yielding the trial court's finding of the "net fair market value" for the back side at $1,500,000).
The sole evidentiary basis for this finding was the former husband's opinion, uncorroborated by any documentation or expert testimony. Although the planner opined that the property could be subdivided, she offered no opinion about the cost of doing so. The former husband said the development cost would be "less than" $200,000, but there is no evidence showing how this figure was calculated, what the component costs would be, whether the figure included all necessary permits and variances (and the fees necessary to process those through the Nassau County government), or whether it included the cost of professionals to assist the former wife, who has no experience or background *729 in real estate development. More importantly, there is no evidence that the former husband has experience or training in real estate development and, consequently, any competence to testify about the process to develop raw land into marketable subdivision lots and the cost of doing so.
The former husband, as an owner of lots 12 and 13, offered his lay opinion on the lots' current value. Generally, an owner of property can testify as to its value, whether or not the owner is qualified as an expert. See Crockett, 708 So.2d at 332. However, this court has described the rationale behind this rule as follows:
[It] is based upon an owner's presumed familiarity with the characteristics of the property, knowledge or acquaintance with its uses and purposes and experience in dealing with it. . . . [An] owner must be shown to have knowledge regarding the property and its value sufficient to qualify him. . . . The presumption that an owner is sufficiently familiar with property to give an admissible opinion as to its value is a fragile one. If it be shown that the owner . . . does not have such familiarity, the opinion evidence is not admissible.
Sun Bank/N. Fla., N.A. v. Edmunds, 624 So.2d 753, 756 (Fla. 1st DCA 1993) (citations, quotation, and alteration in original omitted). Clearly, this rule is not so broad as to permit the former husband to hypothesize the property's net value at a future date after the property is transformed through the application of developmental expertise he does not possess. Yet, that is precisely what the trial court permitted him to do when it accepted his cost opinion as a fundamental premise of the property's development value.
Further, it is undisputed that the mortgage had a balance of $122,295 at the time of trial and encumbers all of lot 12, including the back side awarded to the former wife. The final judgment does not address the mortgage except to make the former husband "solely responsible for said mortgage" and to require him to continue making the regular monthly payments. The final judgment does not require the former husband to obtain a release of the back side of lot 12 from the mortgage lien or otherwise provide a mechanism to obtain one.
There are two consequences of this omission. The first is the immediate creation of an event of default under the terms of the mortgage. Paragraph 17 of the mortgage provides that any transfer of all or part of lot 12, without the lender's prior written consent, gives the lender the right of acceleration. Whether the lender will invoke this provision is unknown. Perhaps the lender will continue to consider itself adequately secured and allow the former husband to continue the monthly payments  but perhaps not. There was no evidence in this regard.
The second consequence of the final judgment's failure to address the mortgage encumbrance on lot 12 is a practical one. The equitable distribution scheme under the final judgment rests on the fundamental finding that the former wife can develop and sell the back side property. Yet the final judgment fails to address how the former wife can sell the back side or use it to finance the development costs if part of the property remains encumbered by the mortgage.
Finally, the former wife's stream of income for support purposes was based on investment income on the basis of facts not presented at trial.
Paragraph X(2) of the final judgment begins with the $1,500,000 presumed net revenue from the sale of the back side residential lots, assumes the former wife will have funds to invest in excess of *730 $1,000,000.00 depending on the cost of her purchase of a suitable replacement home, and then imputes a "reasonable investment income."
This investment income is derived by applying assumptions about the types of investment products available to the former wife (i.e., bonds and certificates of deposits), the return those products are currently yielding, and the proper tax treatment for the development's sale proceeds.
The difficulty is these assumptions are not based on evidence presented at trial. Rather, they are taken from "judicially noticed" facts in the former husband's proposed final judgment submitted to the trial court more than a month after the close of the evidence. This was improper. Judicial notice under the Florida Evidence Code is limited to specific categories of generally known matters, none of which are applicable here. See § 90.202(11), Fla. Stat. (dealing with "generally known" facts); Maradie v. Maradie, 680 So.2d 538, 542 (Fla. 1st DCA 1996) ("[section] 90.202(11) is recognized to be a codification of the common law predating the adoption of Florida's Evidence Code under which `Florida courts have taken judicial notice of facts which are `open and notorious,' involve `common notoriety' or are `commonly known.'").
Further, the Evidence Code contemplates that the request for judicial notice and the taking of notice by the trial court will occur before or at trial as part of the requesting party's case, after notice of the request has been served on the opposing party, enabling the adverse party to prepare to meet the request. See § 90.203, Fla. Stat. (2006). Likewise, when the trial court takes judicial notice of a matter on its own initiative under section 90.204, it must afford the opposing party a "reasonable opportunity to present information relevant to the propriety of taking judicial notice and to the nature of the matter noticed." § 90.204(1), Fla. Stat. (2006). The trial court may not, as was done here, simply adopt purported "facts" submitted to it in an argument in a legal memorandum or proposed judgment. See Smith v. Smith, 934 So.2d 636, 640-41 (Fla. 2d DCA 2006) (holding former husband's demonstrative aid and legal argument to be insufficient to support pension calculation).
Moreover, in arriving at an imputed income for the former wife using these investment assumptions, the final judgment assumes a percentage return that U.S. bonds are "currently paying." Whether the returns these investment products are currently yielding will continue to such indeterminate time in the future that the back side of the property could be developed and sold is simply conjecture. See, e.g., Nelson v. Nelson, 651 So.2d 1252, 1254 (Fla. 1st DCA 1995) ("Trial courts may not consider future or anticipated events in setting current alimony and child support amounts due to the lack of an evidentiary basis or the uncertainty surrounding such future events.").
Based on the foregoing, we reverse the equitable distribution and support plan and remand for further proceedings as to these issues.[*]
KAHN and VAN NORTWICK, JJ., concur.
NOTES
[*] The former wife also challenges the fact that the former husband's pension plan was not determined to be a marital asset and equally distributed. While we have some concern as to this area, the trial court may address this issue as part of the new equitable distribution and support scheme.